**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Brittany S. Scott (State Bar No. 327132)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email:  ltfisher@bursor.com
           bscott@bursor.com
           jwilner@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| KAREN MARTINEZ, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | <u>JURY TRIAL DEMANDED</u> |
| CHOOSE YOUR HORIZON, INC., | |
| Defendant. | |

Plaintiff Karen Martinez ("Plaintiff") brings this action on behalf of herself and all others similarly situated against Choose Your Horizon, Inc. ("Defendant" or "Choose").  Plaintiff brings this action based upon personal knowledge of the facts pertaining to herself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1.      This is a class action lawsuit brought on behalf of all California residents who have accessed and used chooseketamine.com (the "Website"), a website Defendant owns and operates.

2.      Defendant aids employs, agrees, and conspires with Meta,[1] Google, and Twilio (together, the "Third Parties") to intercept communications sent and received by Plaintiff and Class Members, including communications containing protected medical information.  Plaintiff brings this action for legal and equitable remedies resulting from these illegal actions.

## PARTIES

### *Defendant*

3.      Defendant Choose Your Horizon, Inc. is a Delaware Corporation with its principal place of business at 106 E 6th St, Unit 900 Austin, TX, 78701.  Defendant owns and operates the Website.

### *Plaintiff*

4.      Plaintiff Karen Martinez is a natural person and citizen of California, residing in San Mateo, California.

5.      In or around April 2024, Plaintiff visited the Website and purchased low-dose ketamine therapy as a medical treatment.  As part of the purchase process, as is the case with all purchases on the Website, Plaintiff answered a series of questions related to her mental and physical health for the purpose of having a medical professional determine whether ketamine therapy is appropriate for her medical symptoms.  As part of this intake screening questionnaire, Plaintiff was asked to identify what mental health conditions she hoped to treat with ketamine therapy, her state of residence, her pregnancy status, whether she takes medications or illicit drugs,

---

[1] In October 2021, Facebook, Inc. changed its name to Meta Platforms, Inc. Unless otherwise indicated, Facebook, Inc. and Meta Platforms, Inc. are referenced collectively as "Meta."

if she has a diagnosis for certain mental health disorders, if she had considered suicide in the last six months, and other private health information. After making her purchase, she had a mandatory appointment with a "psychiatric clinician" to determine if ketamine therapy was an appropriate treatment before the purchased medication was shipped to her.

6. Plaintiff has had an active Facebook account for several years. Plaintiff routinely accesses Facebook on her computer.

7. Pursuant to the systematic process described herein, Defendant aided and assisted the Third Parties with intercepting Plaintiff's communications, including those that contained personally identifiable information ("PII"), protected health information ("PHI"), and related confidential information. Defendant aided and assisted these interceptions without Plaintiff's knowledge, consent, or express written authorization.

8. After placing her order from the Website, Plaintiff began receiving targeted advertisements from Choose and other advertisements related to ketamine therapy on Facebook.

9. By failing to receive the requisite consent, Defendant breached its duties of confidentiality and unlawfully disclosed Plaintiff's PII and PHI.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000, exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from at least one Defendant.

11. This Court has personal jurisdiction over Defendant because the Website collected and disseminated the PII and PHI giving rise to this lawsuit in this District, Defendant conducts substantial business in this District, Defendant's Website allows California residents to place orders in California, and the conduct giving rise to this action arises out of and relates to that business.

12. Defendant derives substantial revenue from advertising it shows to its users in the state of California. Through the collection of users' data, as described above and below, Defendant is able to hyper-target users with advertising.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this District, and Plaintiff resides in this District.

## FACTUAL ALLEGATIONS

A.     **Background of the California Information Privacy Act ("CIPA")**

14.     The CIPA, Cal. Penal Code § 630, *et seq.*, prohibits aiding or permitting another person to willfully—and without the consent of all parties to a communication—read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from or received at any place within California.

15.     To establish liability under Cal. Penal Code § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> Or
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> Or
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

16.     The applicability of Cal. Penal Code Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the internet, and email.  *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting

privacy); *Bradley v. Google, Inc.*, 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' internet browsing history).

17.    Under Cal. Penal Code § 637.2, Plaintiff and Class Members may seek injunctive relief and statutory damages of $5,000 per violation.

**B.    Background of the California Confidentiality of Medical Information Act ("CMIA")**

18.    Pursuant to the California Confidentiality of Medical Information Act ("CMIA"), a "provider of health care . . . shall not disclose medical information regarding a patient of the provider of health care . . . without first obtaining an authorization, except as provided in subdivision (b) or (c)." Cal Civ. Code § 56.10(a).  "An authorization for the release of medical information . . . shall be valid if it:

(a) Is handwritten by the person who signs it or is in a typeface no smaller than 14-point type.

(b) Is clearly separate from any other language present on the same page and is executed by a signature which serves no other purpose than to execute the authorization.

(c) Is signed and dated . . .

(d) States the specific uses and limitations on the types of medical information to be disclosed.

(e) States the name or functions of the provider of health care, health care service plan, pharmaceutical company, or contractor that may disclose the medical information.

(f) States the name or functions of the persons or entities authorized to receive the medical information.

(g) States the specific uses and limitations on the use of the medical information by the persons or entities authorized to receive the medical information.
(h) States a specific date after which the provider of health care, health care service plan, pharmaceutical company, or contractor is no longer authorized to disclose the medical information.

(i) Advises the person signing the authorization of the right to receive a copy of the authorization."

Cal. Civ. Code § 56.11.

19.     Moreover, a health care provider that maintains information for purposes covered by the CMIA is liable for negligent disclosures that arise as the result of an affirmative act—such as implementing a system that records and discloses online patients' PII and PHI.  Cal. Civ. Code § 56.36(c).  Similarly, if a negligent release occurs and medical information concerning a patient is improperly viewed or otherwise accessed, the individual need not suffer actual damages. Cal. Civ. Code § 56.36(b).

20.     "In addition to any other remedies available at law, any individual may bring an action against any person or entity who has negligently released confidential information or records concerning him or her in violation of this part, for either or both of the following: [¶] (1) ... nominal damages of one thousand dollars ($1,000).  In order to recover under this paragraph, it shall not be necessary that the plaintiff suffered or was threatened with actual damages. [¶] (2) The amount of actual damages, if any, sustained by the patient."  *Sutter Health v. Superior Ct*., 227 Cal. App. 4th 1546, 1551, 174 Cal. Rptr. 3d 653, 656 (2014) (quoting Cal. Civ. Code § 56.36(b)).

**A.     Defendant's Website**

21.     Defendant specializes in "Patient-centered oral ketamine assisted experiences."[2] Through the Website, patients can purchase prescription Ketamine, subject to approval after meeting with a medical professional employed by with Defendant. After making a purchase and meeting with a medical professional, the medication is shipped to the patient. The first treatment is designed to be self-administered while a medical professional affiliated with Defendant supervises the experience by way of a virtual call.

22.     Throughout its Website and marketing materials, Defendant emphasizes that it is a provider of medical services, including requiring an appointment with a doctor before purchase.

---

[2] www.chooseketamine.com.

23.     In order to obtain the prescription medication sold on Defendant's Website, patients complete a questionnaire related to their mental and physical health.  After the questionnaire is completed and an appointment is scheduled, a doctor selected by Defendant reviews the responses to the questionnaire and writes a prescription for a low-dose ketamine treatment, prompting the shipment of the treatment product.  The patient is also supervised by medical professionals selected by Defendant while the treatment and corresponding therapy are administered to the patient.[3]

24.     Defendant's Website is accessible on mobile devices and desktop computers.

**B.      Overview Of The Wiretaps**

**(1)      Meta's Platform and its Business Tools**

25.     The Facebook social-media platform, owned by Meta, describes itself as a "real identity platform,"[4] meaning users are allowed only one account and must share "the name they go by in everyday life."[5]  To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[6]

26.     In 2021, Meta generated over $117 billion in revenue.[7]  With respect to the apps offered by Meta, substantially all of Meta's revenue is generated by selling advertising space.[8]

27.     Meta sells advertising space by highlighting its ability to target users.[9]  Meta can target users so effectively because it surveils user activity both on and off its sites.[10]  This allows Meta to make inferences about users beyond what they explicitly disclose, like their "interests,"

---

[3] *Id.*

[4] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[5] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[6] FACEBOOK, SIGN UP, https://www.facebook.com.

[7] FACEBOOK, META ANNUAL REPORT 2021, https://s21.q4cdn.com/399680738/files/doc_financials/annual_reports/2023/2021-Annual-Report.pdf at 51.

[8] *Id.* at 63.

[9] FACEBOOK, WHY ADVERTISE ON FACEBOOK, INSTAGRAM AND OTHER META TECHNOLOGIES, https://www.facebook.com/business/help/205029060038706.

[10] FACEBOOK, ABOUT META PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

"behavior," and "connections."[11]  Meta compiles this information into a generalized dataset called "Core Audiences," which allows advertisers to reach precise audiences based on specified targeting types.[12]

28.    Advertisers can also build "Custom Audiences."[13]  Custom Audiences enables advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[14]  With Custom Audiences, advertisers can target existing customers directly, and they can also build "Lookalike Audiences," which "leverage[] information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[15]  Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Meta with the underlying data.  They can do so through two mechanisms: by manually uploading contact information for customers or by utilizing Meta's "Business Tools."[16]

29.    As Meta puts it, the Business Tools "help website owners and publishers, app developers, and business partners, including advertisers and others, integrate with [Facebook], understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[17]  Put more succinctly, Meta's Business Tools are bits of code that advertisers can integrate into their websites, mobile applications, and servers, thereby enabling Meta to intercept and collect user activity on those platforms.

---

[11] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[12] https://www.facebook.com/business/news/Core-Audiences.

[13] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[14] FACEBOOK, AD TARGETING, HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[15] FACEBOOK, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[16] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

[17] FACEBOOK, THE META BUSINESS TOOLS, https://www.facebook.com/help/331509497253087.

30.     The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[18]  Meta's Business Tools can also track other events.  Meta offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[19]  Advertisers can even create their own tracking parameters by building a "custom event."[20]

31.     One such Business Tool is the Facebook Pixel (the "Facebook Pixel").  Meta offers this piece of code to advertisers, like Defendant, to integrate into their websites.  The Facebook Pixel "tracks the people and type of actions they take."[21]  When a user accesses a website hosting the Facebook Pixel, Meta's software script surreptitiously directs the user's browser to contemporaneously send a separate message to Meta's servers.  This secret and contemporaneous transmission contains the original GET request sent to the host website, along with additional data that the Facebook Pixel is configured to collect.  This transmission is initiated by Meta code and concurrent with the communications with the host website.  At relevant times, two sets of code were thus automatically run as part of the browser's attempt to load and read Defendant's Website—Defendant's own code and Facebook's embedded code.

32.     Defendant chose to include the Facebook Pixel on its Website.

33.     Meta's own documentation makes clear just how much tracking of private information the Facebook Pixel does.  It describes the Facebook Pixel as code that Meta's business customers can put on their website to "[m]ake sure your ads are shown to the right people.  *Find …*

---

[18] *See* FACEBOOK, META FOR DEVELOPERS: META PIXEL, ADVANCED, https://developers.facebook.com/docs/meta-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR META PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; FACEBOOK, META FOR DEVELOPERS: MARKETING API - APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[19] FACEBOOK, SPECIFICATIONS FOR META PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[20] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also* FACEBOOK, META FOR DEVELOPERS: MARKETING API – APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[21] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

*people who have visited a specific page or taken a desired action on your website*." (Emphasis added.)[22]

34.     Meta instructs such business customers that:

Once you've set up the [Facebook] Pixel, *the pixel will log when someone takes an action on your website*. Examples of actions include adding an item to their shopping cart or making a purchase.  *The Pixel receives these actions, or events*, which you can view on your [Facebook] Pixel page in Events Manager. From there, you'll be able to see the actions that your customers take.  *You'll also have options to reach those customers again through future Meta ads*.[23]

35.     Of course, in healthcare, it is medical specialists and healthcare treatments that users "add to their shopping cart."  They make doctor's appointments rather than making purchases.

36.     The Facebook Pixel code enables Meta not only to help Defendant with advertising to its own patients outside the Website, but also to include individual patients among groups targeted by *other* Facebook advertisers relating to the conditions about which patients communicated on Defendant's Website.

37.     Meta's Business Help Center explains:

Meta *uses marketing data to show ads to people who are likely to be interested in them*. One type of marketing data is website events, which are *actions that people take on your website*.[24]

38.     In other words, Meta sells advertising space by highlighting its ability to target users.[25]  Meta can target users so effectively because it surveils user activity both on and off its

---

[22]     Meta, ABOUT META PIXEL https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Dec. 26, 2023).

[23]     *Id*. (Emphasis added.)

[24]     Meta,    ABOUT    STANDARD    AND    CUSTOM    WEBSITE    EVENTS https://www.facebook.com/business/help/964258670337005?id=1205376682832142    (emphasis added)

[25]     Meta, WHY ADVERTISE ON FACEBOOK, INSTAGRAM AND OTHER META TECHNOLOGIES, https://www.facebook.com/business/help/205029060038706 (last visited Dec. 26, 2023).

sites, including Facebook.[26]  This allows Meta to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and connections.[27]

39.     An example illustrates how the Facebook Pixel works.  Take an individual who, at relevant times, navigated to Defendant's Website and clicked on a link to make begin the process of purchasing a treatment.  When that link was clicked, the individual's browser sent a GET request to Defendant's server requesting that server to load the particular webpage.  As a result of Defendant's use of the Facebook Pixel, Meta's embedded code, written in JavaScript, sent secret instructions back to the individual's browser, without alerting the individual that this was happening.  Meta caused the browser to secretly duplicate the communication with Defendant, transmitting it to Meta's servers, alongside additional information that transcribed the communication's content and the individual's identity.

40.     After collecting and intercepting the information described in the preceding paragraph, Meta processed it, analyzed it, and assimilated it into datasets like Core Audiences and Custom Audiences.

41.     Through the Facebook Pixel, Defendant shared its patients' identities and online activity, including information related to their private medical treatment.

42.     Each time Defendant sent this activity data, it also disclosed a patient's personally identifiable information, including their Facebook ID ("FID").  An FID is a unique and persistent identifier that Facebook assigns to each user.  With it, any ordinary person can look up the user's Facebook profile and name.  Notably, while Meta can easily identify any individual on its Facebook platform with only their unique FID, so too can any ordinary person who comes into possession of an FID.  Meta admits as much on its website.  Indeed, ordinary persons who come into possession of the FID can connect to any Facebook profile.

---

[26]     Meta, ABOUT META PIXEL,
https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[27]     Meta, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS,
https://www.facebook.com/business/ads/ad-targeting

43.    A user who accessed Defendant's Website while logged into Facebook transmitted what is known as a "c_user cookie" to Facebook, which contained that user's unencrypted Facebook ID.

44.    When a visitor's browser had recently logged out of an account, Facebook compelled the visitor's browser to send a smaller set of cookies.

45.    One such cookie was the "fr cookie" which contained, at least, an encrypted Facebook ID and browser identifier.[28]   Facebook, at a minimum, used the fr cookie to identify users.[29]

46.    If a visitor had never created an account, an even smaller set of cookies was transmitted.

47.    At each stage, Defendant also utilized the "_fbp cookie," which attached to a browser as a first-party cookie, and which Facebook used to identify a browser and a user.[30]

48.    The c_user cookie expires after 90 days if the user checked the "keep me logged in" checkbox on the website.[31]  Otherwise, the c_user cookie is cleared when the browser exits.[32]

49.    The The fr cookie expires after 90 days unless the visitor's browser logs back into Facebook.[33]  If that happens, the time resets, and another 90 days begins to accrue[34]

50.    The _fbp cookie expires after 90 days unless the visitor's browser accesses the same website.[35]  If that happens, the time resets, and another 90 days begins to accrue.[36]

---

[28] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012),  http://www.europe-v-facebook.org/ODPC_Review.pdf.

[29] FACEBOOK, PRIVACY CENTER – COOKIES POLICY, https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-1.3.

[30] *Id.*

[31] Seralthan, FACEBOOK COOKIES ANALYSIS (Mar. 14, 2019), https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a.

[32] *Id.*

[33] *See id.*

[34] Confirmable through developer tools.

[35]FACEBOOK, PRIVACY CENTER – COOKIES POLICY, https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-1.3.

[36] Also confirmable through developer tools.

---

51.    The Facebook Pixel used both first- and third-party cookies.  A first-party cookie is "created by the website the user is visiting"—*i.e.*, Defendant's Website.[37]  A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[38]  The _fbp cookie was always transmitted as a first-party cookie.  A duplicate _fbp cookie was sometimes sent as a third-party cookie, depending on whether the browser had recently logged into Facebook.

52.    Meta at a minimum, used the fr, _fbp, and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.  Defendant sent these identifiers alongside the event data.

53.    What is more, when a user provides contact information on the Website, Meta is sent the email address used to check out.  The email address is encrypted by way of a process known as SHA256, which is a way to "hash" written words in a series of random numbers.

54.    The Meta Pixel is designed to collect information about website visitors that can be matched to an individual's Facebook profile for the purpose of sending targeted advertising to that user.  Though the "hashing" would prevent a party that is not Meta from obtaining the subscriber's email address, Meta, as the recipient of the data and the entity that creates the hash, can decrypt the hashed email addresses it receives and match it to the profile of Facebook users.

55.    Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant to disclose her PII and PHI.  Plaintiff was never provided with any written notice that Defendant disclosed the PII and PHI of users of the Website, nor was she provided any means of opting out of such disclosures.  Defendant nonetheless knowingly disclosed Plaintiff's PHI and PII to Facebook.

56.    Specifically, when a patient of Defendant visits the Website to schedule an appointment, Meta deploys the Facebook Pixel with a pixel ID number of 598769757910245, and automatically receives the page URL, which discloses the treatment sought and the patient's Facebook ID via the c_user cookie.

---

[37] PC MAG, FIRST-PARTY COOKIE, https://www.pcmag.com/encyclopedia/term/first-party-cookie. This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[38] PC MAG, THIRD-PARTY COOKIE, https://www.pcmag.com/encyclopedia/term/third-party-cookie. This is also confirmable by tracking network activity.

1

2

3

4

5

6

7

8

9

10

11

12



13

14      **(2)    Google Analytics' Tracking Code**

15      57.    Google Analytics is a web analytics service that allows website owners to track

16    visitor actions on the Website and target them with personalized advertisements.  The code for

17    Google Analytics was present on each page of the Website when Plaintiff accessed the site and

18    followed the steps to make an appointment.

19      58.    As of December 29, 2022, Google's Analytics Help pages instructed health care

20    providers like Defendant not to use Google Analytics "in any manner involving Protected Health

21    Information":

22          Google does not intend users of Google Analytics to create obligations under the
           Health Insurance Portability and Accountability Act, as amended, ("HIPAA"), and
23          makes no representations that Google Analytics satisfies HIPAA requirements. ***If you***
           ***are (or become) a Covered Entity or Business Associate under HIPAA, you may not***
24          ***use Google Analytics for any purpose or in any manner involving Protected Health***
           ***Information***.[39]

25    _____

26    [39]    *Best Practices to Avoid Sending Personally Identifiable Information (PII)*, ANALYTICS HELP,
       https://support.google.com/analytics/answer/6366371?hl=en#zippy=%2Cin-this-article    (emphasis
27    added) (last visited Dec. 29, 2022). The current (2023) version of this webpage now states:

28          HIPAA-regulated entities using Google Analytics must refrain from exposing to
           Google any data that may be considered Protected Health Information (PHI), even if

_____

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    13

59.     Google Analytics collects IP addresses of individual Internet users to facilitate and track Internet communications.  It also collects various cookie-related user identifiers that allow it to link transactions on websites to individual users for the purpose of targeted advertising.

60.     The data is connected to the user's IP address, which is a unique address that identifies a device on the internet.

61.     IP addresses constitute PII. For example, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") characterizes IP addresses as "direct identifiers," 45 C.F.R. § 164.514(e)(2)(B)(2)(xiv), and provides that "[a] covered entity may determine that health information is not individually identifiable health information if; … (2)(i) [t]he following identifiers of the individual or of relatives, employers, or household members of the individual, are removed: … (O) Internet Protocol (IP) address numbers." 45 C.F.R. § 164.514(b)(2)(i)(O). The only alternative to the removal of such information is where:

> [a] person with appropriate knowledge of and experience with generally accepted statistical and scientific principles and methods for rendering information not individually identifiable:
>
> > (i) [a]pplying such principles and methods, determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information; and
> >
> > (ii) [d]ocuments the methods and results of the analysis that justify such determination.

45 C.F.R. § 164.514(b).  On information and belief, these standards were not met here.

62.     Google offers an IP Anonymization tool for entities (like Defendants) using Google Analytics, so that end users (like Plaintiffs and the Class members) will not have their full IP address reported and stored. Google's website explains:

> The IP-masking feature in Universal Analytics sets the last octet of IPv4 user IP addresses and the last 80 bits of IPv6 addresses to zeros in memory shortly after being sent to Google Analytics. The full IP address is never written to disk in this case. . . . This feature is designed to help site owners comply with their own privacy

---

not expressly described as PII in Google's contracts and policies. Google makes no representations that Google Analytics satisfies HIPAA requirements and does not offer Business Associate Agreements in connection with this service.

policies or, in some countries, recommendations from local data protection authorities, which may prevent the storage of full IP address information. [40]

63.    During the relevant time period, Defendant did not use Google's IP Anonymization tool.

64.    As a result of Defendant's decision not to use the IP anonymization feature, Defendant transmitted patients' full IP addresses to Google, meaning that communications were not anonymous, regardless of whether Google also placed ID cookies on the user's device.

65.    Like Meta's Lookalike Audiences, Google offers "Similar Audiences." Google explains on its website:

> To find similar segments, Google Ads looks at the millions of people searching on Google....
>
> A similar segments list is created from a remarketing list or Customer Match list with at least 1,000 cookies *with enough similarity in search behavior to create a corresponding similar segment*.
>
> Website tag and rule-based remarketing lists, as well as Customer Match lists built from email addresses, mailing addresses, and/or phone numbers, can be used to generate similar segments. . . .[41]

(Emphasis added.)

66.    Google explains, for its marketing and developer clients:

> In order for Google Analytics to determine that two distinct hits belong to the same user, a unique identifier, associated with that particular user, must be sent with each hit.
>
> The analytics.js library accomplishes this via the Client ID field, a unique, randomly generated string that gets stored in the browsers cookies, so subsequent visits to the same site can be associated with the same user.
>
> By default, analytics.js uses a single, first-party cookie named _ga to store the Client ID, but the cookie's name, domain, and expiration time can all be customized. Other cookies created by analytics.js include _gid, AMP_TOKEN and _gac_<property-id>.

---

[40] *IP Masking in Universal Analytics*, ANALYTICS HELP (2023), https://support.google.com/analytics/answer/2763052?hl=en (last visited Dec. 29, 2023).

[41] *About Similar Segments for Search*, GOOGLE ADS HELP (2023), https://support.google.com/google-ads/answer/7151628?hl=en#:~:text=To%20find%20similar%20audiences%2C%20Google,visitors%20on%20the%20original%20list (last visited Dec. 29, 2023).

These cookies store other randomly generated ids and campaign information about the user.[42]

67.    For example, when a patient clicked on the link to purchase a treatment on Defendant's Website, the code that was generated related to Google Analytics showed the appointment and state of residence of the user (entered earlier in the process) and various "cookies" that Google used to track individual users.  Defendant's Website is solely devoted to ketamine therapy treatment, so Google Analytics made it easy to identify the medical condition for which the user was seeking a doctor. The Google Analytics cookies in the code generated by the search included strings beginning with "gid" and "cid" (Google Analytics' "Client ID"), followed by strings of unique numbers Google uses to identify the user's device.

68.    Further, Google Analytics is configured on Defendant's final checkout screen to receive the email address the user gives to Defendant when making a purchase. The user in the image below used the email address johnnysmithemail7@gmail.com to check out on the Website. Google Analytics received that email address and the page URL, identifying that the patient is seeking ketamine treatment.

---

[42]    *Cookies    and    User    Identification*, GOOGLE    ANALYTICS, https://developers.google.com/analytics/devguides/collection/analyticsjs/cookies-user-id    (last visited Dec. 29, 2023).





69.     An email address is a unique string of characters which designate an electronic mailbox.  As industry leaders,[43] trade groups,[44] and courts agree,[45] an ordinary person can use an email address to uniquely identify another individual.  Indeed, there exists multiple services that enable anyone with internet access and a credit card to look up who owns a particular email address.[46]

### (3)     Twilio's Segment API

70.     Twilio is "a customer engagement platform used by hundreds of thousands of businesses and more than ten million developers worldwide to build unique, personalized experiences for their customers."[47]

71.     Twilio powers this platform through its Segment API, which offers "world-class customer data infrastructure, so [developers] can design hyper-personalized, omnichannel campaigns across all channels."[48]  In particular, once integrated into a developer's mobile application, the Segment API provides Twilio's platform with "customer identification and segmentation,"[49] and it does this by "collecting and connecting data from other tools and aggregating the data to monitor performance, inform decision-making processes, and create uniquely customized user experiences."[50]

---

[43] Allison Schiff, *Can Email Be The Next Big Online Identifier?*, AD EXCHANGER (Aug. 25, 2020), https://www.adexchanger.com/data-exchanges/can-email-be-the-next-big-online-identifier/ (quoting Tom Kershaw, CTO of Magnite, who said "[a]n email address is universally considered to be PII, so as such it can never be a valid identifier for online advertising").

[44] NETWORK ADVERTISING INITIATIVE, NAI CODE OF CONDUCT 19 (2019), https://thenai.org/wp-content/uploads/2021/07/nai_code2020.pdf (identifying email as PII).

[45] *See, e.g.*, *United States v. Hastie*, 854 F.3d 1298, 1303 (11th Cir. 2017) ("Email addresses fall within the ordinary meaning of information that identifies an individual. They can prove or establish the identity of an individual.").

[46] *See, e.g.*, www.beenverified.com.

[47] What is Twilio? An introduction to the leading customer engagement platform, TWILIO, https://www.twilio.com/en-us/resource-center/what-is-twilio-an-introduction-to-the-leading-customer-engagement-platform (last accessed Apr. 12, 2024).

[48] TWILIO SEGMENT, https://segment.com/twilio/.

[49] Ingrid Lunden, *Twilio Confirms It Is Buying Segment For $3.2b In An All-Stock Deal*, TechCrunch (Oct. 12, 2020), https://techcrunch.com/2020/10/12/twilio-confirms-it-is-buying-segment-for-3-2b-in-an-all-stock-deal/.

[50] Segment.io Defined, INDICATIVE, https://www.indicative.com/resource/segment-io/.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    18

72.     Defendant utilizes the Segment API on its Website and sends its consumers' PII to Twilio through the Segment API in order to assist with Defendant's marketing, advertising, and analytics efforts.

73.     Twilio entices developers to integrate the Segment API by underscoring its signature feature: "Engage."  Formerly known as Personas, Engage "is a powerful personalization platform that helps you create unified customer profiles."[51]  Twilio creates these "unified customer profiles" by "tak[ing] event data from across devices and channels and intelligently merg[ing] it into complete user- or account-level profiles."[52]

74.     Twilio builds these personas through "Segment Identity Resolution."  This process "merges the complete history of each customer into a single profile, no matter where they interact with your business."[53]  The Segment Identity Resolution supports, among other identifiers, "cookie IDs, device IDs, emails, and custom external IDs," helping Twilio capture "a user's interaction across web, mobile, server and third party partner touch-points in real-time[.]"[54]  The Segment Identity Resolution then combines these "multiple external IDs," into "one persistent ID,"[55] culminating into its offered Persona.

75.     With Identity Resolution, Twilio associates a users' unique ID with a corresponding Persona Profile on Twilio's platform.  Because Twilio assembles information from other sources into the Persona Profile, AAID alone allows Twilio to identify a particular person.

76.     Twilio leverages these profiles to assist developers, like Defendant, in enhancing their marketing, advertising, and analytics efforts.

77.     Defendant discloses users' PII to Twilio through the Segment API so Twilio can better target its marketing campaigns.  Defendant does this through Twilio's "Audience" feature,

---

[51] Documentation, SEGMENT, https://segment.com/docs/engage/.

[52] *Id.*

[53] Personas Identity Resolution Overview, SEGMENT, https://segment.com/docs/ personas/identity-resolution/#:~:text=The%20Segment%20Identity%20Graph% 20merges,they%20interact%20with%20your%20business.

[54] *Id.*

[55] *Id.*

which "group[s] users or accounts based on event behavior and traits that Segment tracks."[56]  In other words, Audiences allows for targeted marketing of advertisements at Engage profiles that fit specific parameters.  As explained below, Defendant builds these marketing campaigns through Twilio's analytics services.

78.    Defendant also discloses users' PII to Twilio, through the Segment API, so it can better target advertisements.  After Defendant discloses users' PII, Twilio compiles and transmits that information to other third parties that Defendant utilizes for targeted advertising.[57] Twilio labels these companies "Segment Destinations," which are  tools that businesses use for personalization and marketing.[58]  In this role, Twilio acts as a facilitator, compiling PII so developers can "personalize messages across channels, optimize ad spend, and improve targeting."[59]  When Twilio transmits PII to Facebook, for example, it sends "an expanded list of identifiers or traits to Facebook, so that Facebook can try to use these additional datapoints to match to their user profiles."[60]  The same goes for Google, with Twilio helping developers "run advertising campaigns without having to manually update the list of users to target in Adwords campaigns."[61]  Defendant utilizes Twilio to amplify its advertising campaigns.

79.    Twilio describes the above process as "building an Audience," meaning it "group[s] users or accounts based on event behavior and traits that Segment tracks."[62]  As an example, Twilio lets developers "create[e] an 'inactive accounts' audience that lists paid accounts with no logins in 60 days."[63]  After, "developers can push the audience to your marketing and analytics tools."[64]

---

[56] ENGAGE AUDIENCE OVERVIEW, SEGMENT, https://segment.com/docs/engage/audiences/.

[57] USING ENGAGE DATA, SEGMENT, https://segment.com/docs/engage/using-engage-data/ (these third parties include Facebook, Google, and Salesforce).

[58] *Id.*

[59] *Id.*

[60] PERSONAS FACEBOOK CUSTOM AUDIENCES DESTINATION, SEGMENT, https://segment.com/docs/connections/destinations/catalog/personas-facebook-custom-audiences/.

[61] *Id.*

[62] ENGAGE AUDIENCES OVERVIEW, SEGMENT, https://segment.com/docs/engage/audiences//.

[63] DOCUMENTATION, SEGMENT, https://segment.com/docs/engage/.

[64] *Id.*

80.     In short, Defendant utilizes the Segment API to analyze user data, launch marketing campaigns, and target specific users or specific groups of users for advertisements. In this case, the data used was information about Plaintiff's and Class Members' medical conditions and treatment.

81.     The Segment API is deployed throughout Defendant's Website.





82.     By law, Plaintiff is entitled to privacy in her protected health information and confidential communications.  Defendant deprived Plaintiff of her privacy rights when it: (1) implemented a system that surreptitiously tracked, recorded, and disclosed Plaintiff's and other

online patients' confidential communications, PII and PHI; (2) disclosed patients' PHI to the Third

Parties—unauthorized third-party eavesdroppers; and (3) undertook this pattern of conduct without

notifying Plaintiff and without obtaining her express written consent.  Plaintiff did not discover that

Defendant disclosed her PII and PHI to the Third Parties, and assisted the Third Parties with

intercepting her communications, until April 2024.

83.    The non-consensual interceptions and disclosures of Plaintiff's and Class Members'

PII and PHI occurred in California.

**C.    Federal Warning on Tracking Codes on Healthcare Websites**

84.    The government has issued guidance warning that tracking code like the Facebook

Pixel and Google Analytics may violate federal privacy law when installed on healthcare websites.

The statement, titled "Use of Online Tracking Technologies by HIPAA Covered Entities and

Business Associates" (the "Bulletin"), was issued by the Department of Health and Human

Services' Office for Civil Rights ("OCR") in December 2022.[65]

85.    Healthcare organizations regulated under HIPAA may use third-party tracking tools,

such as the Facebook Pixel, in a limited way, to perform analysis on data key to operations.  They

are not permitted, however, to use these tools in a way that may expose patients' PHI to these

vendors.  The Bulletin explains:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking
> technologies in a manner that would result in impermissible disclosures of PHI to
> tracking technology vendors or any other violations of the HIPAA Rules. ***For
> example, disclosures of PHI to tracking technology vendors for marketing
> purposes, without individuals' HIPAA-compliant authorizations, would constitute
> impermissible disclosures.***[66]

86.    The Bulletin discusses the types of harm that disclosure may cause to the patient:

> An impermissible disclosure of an individual's PHI not only violates the Privacy
> Rule[fn] but also may result in a wide range of additional harms to the individual or
> others. For example, an impermissible disclosure of PHI may result in identity theft,

---

[65]    HHS.gov, Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

[66]    *Id.* (Emphasis added.)

financial loss, ***discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI***. Such disclosures can reveal incredibly sensitive information about an individual, ***including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment***. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, ***because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule***.[67]

87.     Plaintiff and Class Members face the exact risks about which the government expresses concern.  Defendant disclosed Plaintiff's and Class Members' search terms about health conditions for which they seek doctors; their contacting of doctors to make appointments; the frequency with which they take steps relating to obtaining healthcare for certain conditions; and where they seek medical treatment.  This information is, as described by the OCR in its bulletin, "highly sensitive."

88.     The Bulletin goes on to make clear how broad the government's view of protected information is.  It explains:

> This information might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, ***or any unique identifying code***.[68]

89.     Crucially, that paragraph in the government's Bulletin continues:

> ***All such [individually identifiable health information ("IIHI")] collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services.*** This is because, ***when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care***.[69]

---

[67]     *Id.* (Emphasis added.)

[68]     *Id*. (Emphasis added.)

[69]     *Id*. (Emphasis added.)

90.     Then, in July 2022, the Federal Trade Commission ("FTC") and the Department of Health and Human Services ("HHS") issued a joint press release warning healthcare providers about the privacy and security risks arising from the use of online tracking technologies:

> The Federal Trade Commission and the U.S. Department of Health and Human Services' Office for Civil Rights (OCR) are cautioning [healthcare providers] and telehealth providers about the privacy and security risks related to the use of online tracking technologies integrated into their websites or mobile apps that may be impermissibly disclosing consumers' sensitive personal health data to third parties.
>
> "When consumers visit a [healthcare provider's] website or seek telehealth services, they should not have to worry that their most private and sensitive health information may be disclosed to advertisers and other unnamed, hidden third parties," said Samuel Levine, Director of the FTC's Bureau of Consumer Protection. "The FTC is again serving notice that companies need to exercise extreme caution when using online tracking technologies and that we will continue doing everything in our powers to protect consumers' health information from potential misuse and exploitation."
>
> "Although online tracking technologies can be used for beneficial purposes, patients and others should not have to sacrifice the privacy of their health information when using a [healthcare provider's] website," said Melanie Fontes Rainer, OCR Director. "OCR continues to be concerned about impermissible disclosures of health information to third parties and will use all of its resources to address this issue."
>
> The two agencies sent the joint letter to approximately 130 [healthcare providers] and telehealth providers to alert them about the risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities. These tracking technologies gather identifiable information about users, usually without their knowledge and in ways that are hard for users to avoid, as users interact with a website or mobile app.
>
> In their letter, both agencies reiterated the risks posed by the unauthorized disclosure of an individual's personal health information to third parties. For example, the disclosure of such information could reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, and where an individual seeks medical treatment.
>
> . . . Through its recent enforcement actions against BetterHelp, GoodRx and Premom, as well as recent guidance from the FTC's Office of Technology, the FTC has put companies on notice that they must monitor the flow of health information to third parties that use tracking technologies integrated into websites and apps. The unauthorized disclosure of such information may violate the FTC Act and could constitute a breach of security under the FTC's Health Breach Notification Rule. . . .[70]

---

[70]    Federal Trade Commission, *FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies*, July 20, 2023,

Therefore, Defendant's conduct is directly contrary to clear pronouncements by the FTC and HHS.

91.     In light of, and in addition to, the government's own issued guidance above, news sources are also warning that tracking code, like the Facebook Pixel, poses risks of violating federal privacy law and HIPAA:

Federal regulators are warning [healthcare providers] and telehealth providers about the data privacy risks of using third-party tracking technologies.

These services, like [Facebook Tracking] Pixel or Google Analytics, could violate the Health Insurance Portability and Accountability Act (HIPAA) or Federal Trade Commission (FTC) data security rules, officials said.

The FTC and the U.S. Department of Health and Human Services' Office for Civil Rights (OCR) issued a rare joint release announcing that 130 [healthcare providers] and telehealth providers received a letter warning them about the data privacy and security risks related to the use of online tracking technologies integrated into their websites or mobile apps.... "The compliance buck still stops with you. Furthermore, your company is legally responsible even if you don't use the data obtained through tracking technologies for marketing purposes."[71]

Fierce Healthcare also spoke up in an April 3, 2023 article:

Nearly all nonfederal acute care [healthcare providers'] websites track and transfer data to a third party, potentially fueling the unwanted disclosures of patients' sensitive health information and opening up that [healthcare provider] to legal liability, according to a recently published University of Pennsylvania analysis. [https://www.healthaffairs.org/doi/full/10.1377/hlthaff.2022.01205]. The census of more than 3,700 [healthcare provider] homepages found at least one third-party data transfer among 98.6% of the websites as well as at least one third-party cookie on 94.3%, researchers wrote in Health Affairs.

The [healthcare providers'] homepages had a median of 16 third-party transfers… Many of these complaints cite Facebook parent company Meta's Pixel tracker, which a June 2022 investigation from The Markup [https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites] detected on about a third of [health care providers'] websites. That

---

https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking.

[71] Heather Landi, *Regulators warn hospitals and telehealth companies about privacy risks of Meta, Google tracking tech*, Fierce Healthcare, July 21, 2023, https://www.fiercehealthcare.com/health-tech/regulators-warn-hospitals-and-telehealth-companies-about-privacy-risks-meta-google

report found evidence that, in some instances, the sensitive data transferred to third parties met the criteria for a HIPAA violation.[72]

Health Affairs also published an article in April 2023, stating:

> By including third-party tracking code on their websites, [healthcare providers] are facilitating the profiling of their patients by third parties. These practices can lead to dignitary harms, which occur when third parties gain access to sensitive health information that a person would not wish to share. These practices may also lead to increased health-related advertising that targets patients, as well as to legal liability for [healthcare providers].[73]

92.     On March 18, 2024. HHS published a revised version of the Bulletin, which further clarified that "identifying information showing [a patient's] visit to [a public] webpage is a disclosure of PHI to the extent that the information is both identifiable and related to the individual's health or future health care."[74]

93.     This is further evidence that the data that Defendant chose to share is protected Personal Information. The sharing of that information was a violation of Class Members' rights.

## **CLASS ALLEGATIONS**

94.     Class Definition: Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of herself and other similarly situated individuals defined as all persons who, during the class period, had their personally identifiable information or protected health information improperly disclosed to third party entities, as a result of using the Website while located in California (the "Class").

---

[72] Dave Muoio, *Almost every hospital's homepage is sending visitors' data to third parties, study finds*, FIERCE HEALTHCARE, Apr. 3, 2023, https://www.fiercehealthcare.com/providers/almost-every-hospital-homepage-sending-visitors-data-third-parties-study-finds

[73] Ari B. Friedman, et al., *Widespread Third-Party Tracking On Hospital Websites Poses Privacy Risks For Patients And Legal Liability For Hospitals*, HEALTH AFFAIRS, Vol. 42, No. 24, April 2023, https://www.healthaffairs.org/doi/10.1377/hlthaff.2022.01205

[74]     *HHS.gov, Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.*

---

95.     Plaintiff reserves the right to modify the class definition or add sub-classes as necessary prior to filing a motion for class certification.

96.     The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after considering of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement.

97.     Excluded from the Class is Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

98.     <u>Numerosity/Ascertainability</u>.  Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable.  The exact number of Class Members is unknown to Plaintiff at this time; however, it is estimated that there are thousands of individuals in the Class.  The identity of such membership is readily ascertainable from Defendant's records and non-party records, such as those of Meta, Google, and Twilio.

99.     <u>Typicality</u>.  Plaintiff's claims are typical of the claims of the Class because Plaintiff used the Website and, as a result of Defendant's unlawful conduct, had her PII and PHI intercepted by third parties without her express written authorization or knowledge.  Plaintiff's claims are based on the same legal theories as the claims of other Class Members.

100.    <u>Adequacy</u>.  Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members.  Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Class.  Plaintiff is represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically.  Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the members of the Class.

101.    <u>Common Questions of Law and Fact Predominate/Well Defined Community of Interest.</u>  Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class because Defendant has acted on

grounds generally applicable to the Class.  Such generally applicable conduct is inherent in Defendant's wrongful conduct.  Questions of law and fact common to the Class includes:

(a)  Whether Defendant intentionally tapped the lines of internet communication between patients and their medical provider;

(b)  Whether Defendant's Website contains code that permits third parties, such as Meta Google, and Twilio, to intercept patients' PII, PHI, and related communications;

(c)  Whether Meta, Google, and Twilio are third-party eavesdroppers;

(d)  Whether Plaintiff's and Class Members' communications via the Website and the resultant interceptions thereof constitute an affirmative act of communication;

(e)  Whether Defendant's conduct, which allowed Meta, Google, and Twilio— unauthorized persons—to view Plaintiff's and Class Members' PII and PHI, resulted in a breach of confidentiality;

(f)  Whether Defendant violated Plaintiff's and Class Members' privacy rights by using third-party technology, such as the Facebook Pixel, Google Analytics, and the Segment API, to allow third parties to intercept patients' online communications along with information that uniquely identified the patients;

(g)  Whether Plaintiff and Class Members are entitled to damages under CIPA, the CMIA, or any other relevant statute; and

(h)  Whether Defendant's actions violate Plaintiff's and Class Members' privacy rights as provided by the California Constitution and common law.

102.  <u>Superiority.</u>  Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including

providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

**COUNT I**
**Violation of the California Invasion of Privacy Act**
**Cal. Penal Code § 631**

103. Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the Class.

104. The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638. CIPA begins with its statement of purpose – namely, that the purpose of CIPA is to "protect the right of privacy of the people of [California]" from the threat posed by "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications . . . ." Cal. Penal Code § 630.

105. A person violates California Penal Code § 631(a), if:

> by means of any machine, instrument, or contrivance, or in any other manner, [s/he] intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or [s/he] willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [s/he] uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained . . . .

Cal. Penal Code § 631(a).

106. Further, a person violates § 631(a) if s/he "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned" in the preceding paragraph. *Id.*

107. To avoid liability under § 631(a), a defendant must show it had the consent of <u>all</u>

1    parties to a communication.

2        108.    At all relevant times, Defendant aided, agreed with, and conspired with Meta,

3    Google, and Twilio to track and intercept Plaintiff's and Class Members' internet communications

4    while accessing www.chooseketamine.com.  These communications were intercepted without the

5    authorization and consent of Plaintiff and Class Members.

6        109.    Defendant, when aiding and assisting the wiretapping, which occurred in California,

7    intended to help Meta, Google, and Twilio learn some meaning of the content in the URLs and the

8    content the visitor requested.

9        110.    The following items constitute "machine[s], instrument[s], or contrivance[s]" under

10   the CIPA, and even if they do not, the Facebook Pixel, Google Analytics, and Segment API fall

11   under the broad catch-all category of "any other manner":

12       a.    The computer codes and programs Meta, Google, and Twilio used to track

13             Plaintiff's and Class Members' communications while they were navigating

14             chooseketamine.com;

15       b.    Plaintiff's and Class Members' browsers;

16       c.    Plaintiff's and Class Members' computing and mobile devices;

17       d.    Meta's, Google's, and Twilio's web and ad servers;

18       e.    The web and ad-servers from which Meta, Google, Twilio tracked and

19             intercepted Plaintiff's and Class Members' communications while they were

20             using a web browser to access or navigate chooseketamine.com;

21       f.    The computer codes and programs used by Meta, Google, and Twilio to

22             effectuate their  tracking and interception of Plaintiff's and Class Members'

23             communications    while    they    were    using    a    browser    to    visit

24             chooseketamine.com; and

25       g.    The plan Meta and Google carried out to effectuate their tracking and

26             interception of Plaintiff's and Class Members' communications while they

27             were using a web browser or mobile application to visit chooseketamine.com.

28       111.    The patient communication information that Defendant transmitted using the

Facebook Pixel, Google Analytics, and Segment API, such as information regarding prescription ketamine therapy treatment, constituted PHI.

112.    As demonstrated hereinabove, Defendant violated CIPA by aiding and permitting third parties to receive its patients' online communications through the Website without their consent.

113.    As a result of the above violations, Defendant is liable to Plaintiff and other Class Members in the amount of, the greater of, $5,000 dollars per violation or three times the amount of actual damages.  Additionally, Cal. Penal Code § 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages."

## COUNT II
### Violation of the California Confidentiality of Medical Information Act
### Cal. Civ. Code § 56.10

114.    Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the Class.

115.    Under the California Confidentiality of Medical Information Act, Cal. Civ. Code § 56.10 ("CMIA"), providers of health care are prohibited from disclosing medical information relating to their patients without a patient's authorization.  Medical information refers to "any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care . . . regarding a patient's medical history, mental or physical condition, or treatment.  "Individually Identifiable" means that the medical information includes or contains any element of personal identifying information sufficient to allow identification of the individual . . . ."

116.    Defendant is a "provider of healthcare" under the CMIA because it (1) employs doctors to review patient's conditions and write prescriptions for its products (Cal. Civ. Code §56.05(p)) and because it maintains medical information and offers software to consumers that is designed to maintain medical information for the purpose of allowing its users to manage their

information or make the information available to a healthcare provider, or for the diagnosis,

treatment, or management of a medical condition (Cal. Civ. Code §56.06(a)-(b)).

117.    Plaintiff and Class Members are patients, and, as a health care provider, Defendant

had an ongoing obligation to comply with the CMIA's requirements.

118.    As set forth hereinabove, a Facebook ID, IP address, email address, or Twilio ID is

an identifier sufficient to allow identification of an individual.  Along with patients' Facebook ID,

email address, and IP address, Defendant disclosed to the Third Parties several pieces of

information regarding its patients' use of Defendant's Website, which, on information and belief,

included, but was not limited to: patient medical conditions, medical concerns, treatment patients

were seeking, and the fact that patients were seeking a prescription for treatment of those

conditions.

119.    This patient information was derived from a provider of health care regarding

patients' medical treatment and physical condition.  Accordingly, it constituted medical

information pursuant to the CMIA.

120.    As demonstrated hereinabove, Defendant failed to obtain its patients' valid

authorization for the disclosure of medical information.

121.    Pursuant to CMIA § 56.11, a valid authorization for disclosure of medical

information must: (1) be "[c]learly separate from any other language present on the same page and

is executed by a signature which serves no other purpose than to execute the authorization"; (2) be

signed and dated by the patient or his representative; (3) state the name and function of the third

party that receives the information; and (4) state a specific date after which the authorization

expires.  Accordingly, information set forth in Defendant's Website Privacy Policy does not

qualify as a valid authorization.

122.    Based on the above, Defendant violated the CMIA by disclosing its patients'

medical information to Meta, Google, and Twilio along with the patients' Facebook IDs, email

addresses, and IP addresses.

123.    Under the CMIA, a patient may recover compensatory damages, punitive damages

not to exceed $3,000 dollars and attorneys' fees not to exceed $1,000, and the costs of litigation for

any violating disclosure of medical information.  Alternatively, a patient may recover nominal damages of $1,000 for any negligent release of medical information.

## COUNT III
### Invasion of Privacy Under California's Constitution/Intrusion Upon Seclusion

124.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the members of the Class.

125.    Plaintiff and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications and protected health information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff's and Class Members' knowledge or consent.

126.    At all relevant times, by using the Facebook Pixel to record and communicate patients' Facebook IDs, Google Analytics to record and communicate patients' IP addresses and emails, and Segment API to record and communicate users' identifying information, alongside their confidential medical communications, Defendant intentionally invaded Plaintiff's and Class Members' privacy rights under the California Constitution, as well as intruded upon Plaintiff's and Class Members' seclusion.

127.    Plaintiff and Class Members had a reasonable expectation that their communications, identities, health information, and other data would remain confidential, and that Defendant would not install wiretaps on chooseketamine.com.

128.    Plaintiff and Class Members did not authorize Defendant to record and transmit Plaintiff's and Class Members' private medical communications alongside their personally identifiable health information.

129.    This invasion of privacy was serious in nature, scope, and impact because it related to patients' private medical communications.  Moreover, it constituted an egregious breach of the societal norms underlying the privacy right.

130.    Accordingly, Plaintiff and Class Members seek all relief available for invasion of privacy claims under California's Constitution and common law.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and Class Members, request judgment against Defendant and that the Court grant the following:

A.    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as the representative of the Class, and Plaintiff's attorneys as Class Counsel to represent the Class Members.

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct alleged in this Complaint pertaining to the misuse and/or disclosure of the Private Information of Plaintiff and Class Members;

C.    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

D.    For an award of damages, including, but not limited to, actual, consequential, statutory, punitive, and nominal damages, as allowed by law in an amount to be determined;

E.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.    For prejudgment interest on all amounts awarded; and

G.    Such other and further relief as this Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.


Dated:  May 9, 2024                              **BURSOR & FISHER, P.A**.

                                                 By:  ___*/s/ Brittany S. Scott*_____
                                                          Brittany S. Scott

                                                 L. Timothy Fisher (State Bar No. 191626)
                                                 Brittany S. Scott (State Bar No. 327132)
                                                 Joshua R. Wilner (State Bar No. 353949)

1990 North California Blvd., Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email:  ltfisher@bursor.com
            bscott@bursor.com
            jwilner@bursor.com

*Attorneys for Plaintiff*