1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

KAREN MARTINEZ, et al.,

Plaintiffs,

v.

CHOOSE YOUR HORIZON, INC.,

Defendant.

Case No. 24-cv-02798-LB

**ORDER DENYING MOTION TO DISMISS AND GRANTING MOTION TO COMPEL ARBITRATION**

Re: ECF No. 39

## INTRODUCTION

In this putative class action, plaintiffs Karen Martinez and Eli Silva — consumers of defendant Choose Your Horizon's (CYH's) services for ketamine-treatment products sold via CYH's website — allege that CYH intercepted their personally identifying information (PII) and personal health information (PHI) and disclosed it to third parties, in violation of California privacy statutes. CYH moved to dismiss for lack of personal jurisdiction — it is incorporated and headquartered elsewhere, provides services nationally, and derives thirteen percent of its revenue from California consumers — and, alternatively, to compel plaintiff Martinez's claims to arbitration under its terms of service. The plaintiffs counter that shipping ketamine products to the district establishes personal jurisdiction, the arbitration clause does not preclude a lawsuit for interception of information before the plaintiff accepted the terms of service, the arbitration clause covers ketamine services but not

1    privacy breaches, and the clause is a procedurally unconscionable contract of adhesion that is also

2    substantively unconscionable because it does not specify the plaintiffs' fees.

3        There is personal jurisdiction: CYH did business with known California customers, required

4    and facilitated their communication with California medical clinicians, and intercepted their

5    personal identifying information. *Briskin v. Shopify, Inc.*, 135 F.4th 739, 752–53, 756–58 (9th Cir.

6    2025) (en banc). The arbitration clause is not unconscionable, and it applies to plaintiff Martinez's

7    claims.[1]

**STATEMENT**

9    **1.   The Alleged Interceptions and Claims**

10        CYH, a Delaware corporation with its principal place of business in Texas, sells prescription

11    oral ketamine treatments to consumers via its website chooseketamine.com. Prospective customers

12    must complete a questionnaire about their mental and physical health and then meet with a CYH

13    medical professional, who must approve the prescription and purchase. The ketamine is mailed to

14    customers, who self-administer the first dose, supervised by CYH medical professional via a virtual

15    call.[2] The plaintiffs allege that CYH emphasizes on its website and in marketing materials that it is a

16    medical-services provider, including by requiring an appointment with a doctor before fulfilling a

17    prescription.[3] CYH's CEO declares that CYH facilitates the scheduling of appointments between

18    prospective patients and medical providers, does not determine treatment suitability, and merely

19    allows the patients to "pre-purchase ketamine therapy treatment packages that are dependent on the

20    establishment of a doctor-patient relationship that CYH does not control."[4]

21        Plaintiffs Karen Martinez and Eli Silva, citizens of California, visited CYH's website in April

22

---

23    [1] CYH does not contend that plaintiff Silva is subject to the arbitration agreement. Opp'n – ECF No.
     42 at 9 n.2 (making this point); Reply – ECF No. 43 (arguing only that plaintiff Martinez is bound by
24    the arbitration clause). Citations refer to material in the Electronic Case File (ECF); pinpoint citations
     are to the ECF-generated pages at the top of documents.

25    [2] First Am. Compl. (FAC) – ECF No. 35 at 2 (¶ 26), 7–8 (¶¶ 51–53); Holland Suppl. Decl. – ECF No.
     43-1 at 1–2 (¶¶ 2–6) (CYH does not ship or otherwise distribute the ketamine treatment packages); *cf.*
26    Opp'n – ECF No. 42 at 6 (contending that CYH ships physical medication); FAC – ECF No. 35 at 7
     (¶ 51) (alleges that "medication is shipped to the patient" without specifying the shipper).

27    [3] FAC – ECF No. 35 at 7–8 (¶¶ 51–53).

28    [4] Holland Suppl. Decl. – ECF No. 43-1 at 1–3 (¶¶ 3–7).

1    2024 and August 2023, respectively, and completed the questionnaires. Ms. Martinez purchased

2    ketamine treatments.[5] Thereafter, both received advertisements from CYH and other advertisements

3    related to ketamine treatment via Facebook (now Meta Platforms), without their consent.[6]

4    CYH "provides ketamine therapy" in twenty-one states, including California, and Naltrexone

5    (an opioid antagonist) in all fifty states.[7] It derives thirteen percent of its revenue from California

6    and does not hyper-target advertising to California residents and instead advertises in a

7    "substantially similar manner to all other states in which it actively provides services."[8]

8    The plaintiffs sued CYH individually and on behalf of a California class for three counts of

9    invasion of privacy, in violation of the California Invasion of Privacy Act, Cal. Penal Code § 631,

10    the California Confidentiality of Medical Information Act, Cal. Civ. Code § 56.10, and the

11    California Constitution.[9]

12

13    **2. The Arbitration Clause**

14    Beginning on March 28, 2024, CYH's terms of use had the following clause:

15    > Any controversy, dispute or claim arising out of, or relating in any way to these
   > Terms or your use of the Site or Service will be resolved by binding arbitration rather
16    > than in court.

17    > There is no judge or jury in arbitration, and court review of an arbitration award is
   > limited. Your claims cannot be brought as a class action. However, an arbitrator can
18    > award on an individual basis the same damages and relief as a court. Judgment on
   > the award rendered by the arbitrator(s) may be entered in any court having
19    > jurisdiction thereof.

20    > . . . .

   > Choose Your Horizon and you each agree that any dispute resolution proceedings
21    > will be conducted only on an individual basis and not in a class or representative

22

23

24    ---

[5] FAC – ECF No. 35 at 2–3 (¶¶ 27–28, 33–34).

[6] *Id.* at 2 (¶ 25), 3 (¶ 31), 4 (¶ 37).

25    [7] Holland Decl. – ECF No. 39-1 at 5 (¶ 17) (ketamine therapy in Arizona, Colorado, California, Texas,
   Florida, Georgia, Ohio, Connecticut, Washington State, Michigan, Massachusetts, New Hampshire,
26    New York, Tennessee, Montana, Iowa, Minnesota, Maine, Oregon, Wisconsin, and Virginia).
   Naltrexone is an opioid antagonist. Fed. R. Evid. 201(b) (authorizing judicial notice).

27    [8] Holland Decl. – ECF No. 39-1 at 5 (¶¶ 18–19).

28    [9] FAC – ECF No. 35 at 34–39 (¶¶ 140–67).

1    action. If for any reason a claim proceeds in court rather than in arbitration, Choose
Your Horizon and you each waive any right to a jury trial. [10]

2

3    In April 2024, the website required customers, like Ms. Martinez, to check a box agreeing to

4    the website's terms of service and privacy policy, both presented via a hyperlink, before

5    completing the purchase.[11] The purchase page listed the purchased treatment package and cost and

6    — in this order —required a customer to input patient information (email, name, billing address,

7    and shipping address) and credit-card information (number, CVC, and expiration date), check the

8    box "I agree to the Terms of Use and Privacy Policy," hyperlinked in blue, and then click Pay to

9    complete the transaction.[12]

10    In April 2024, after customers paid for treatments, the website automatically redirected them to

11    a page to schedule a mandatory consultation — after agreeing to the website's terms of service and

12    privacy policy, via a blue hyperlink — with a medical provider.[13] The scheduling page required

13    selecting a clinician in the customer's state, inputting personal-identification information (name,

14    email, date of birth, driver's license or state ID number, and shipping address), and agreeing — in a

15    final section titled Terms & Conditions to the blue hyperlinked Terms of Use, Privacy Policy, and

16    Notice of Privacy Policy. The section reads, "I agree to Terms of Use [blue hyperlink to website],

17    Privacy Policy [same], and Notice of Privacy Practices [same]," and is followed by a checkbox: "I

18    have read and agreed to the terms above." Only after completing the process can the customer click

19    Complete Appointment.[14] CYH's records confirm that Ms. Martinez inputted the required personal

20    information, confirmed that she read and agreed to the terms of service and privacy policy, and then

21    scheduled an appointment with a clinician.[15]

22

23

24    [10] Holland Decl. – ECF No. 39-1 at 3–4 (¶ 12), 5 (¶ 16). The omitted paragraph describes initiating
arbitration by sending an email.

25    [11] *Id.* at 1–2 (¶ 4).

26    [12] *Id.*; Screenshot, Ex. A to *id.* – ECF No. 39-2.

27    [13] Holland Decl. – ECF No. 39-1 at 2–3 (¶¶ 8–11).

28    [14] *Id.*; Screenshot, Ex. B to *id.* – ECF No. 39-3.

[15] Holland Decl. – ECF No. 39-1 at 3 (¶ 11); Record, Ex. C to *id.* – ECF No. 39-4.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 3. Procedural History

The court has subject-matter jurisdiction under the Class Action Fairness Act. 28 U.S.C § 1332(d). The parties consented to magistrate-judge jurisdiction.[16] *Id.* § 636(c). The court held a hearing on June 26, 2025.

## ANALYSIS

### 1. Personal Jurisdiction

A plaintiff opposing a defendant's challenge to personal jurisdiction must establish that jurisdiction is proper. *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1068 (9th Cir. 2015). The court may consider affidavits and other evidence. *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001), *abrogated on other grounds by Williams v. Yamaha Motor Co.*, 851 F.3d 1015 (9th Cir. 2017). When a defendant relies on written materials, rather than an evidentiary hearing, the plaintiff need make only a prima facie showing of jurisdictional facts to withstand a motion to dismiss. *Ranza*, 793 F.3d at 1068. Uncontroverted allegations are taken as true, and conflicts between parties — such as conflicting statements in affidavits — must be resolved in the plaintiff's favor. *Id.* A court may not assume as true allegations in a pleading that are contradicted by affidavit. *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011); *accord Ranza*, 793 F.3d at 1068 (a plaintiff may not rest on the bare allegations of the complaint).

No federal statute conveys personal jurisdiction. The court thus applies California law. Fed. R. Civ. P. 4(k)(1)(A); *Herbal Brands, Inc. v. Photoplaza, Inc.*, 72 F.4th 1085, 1089 (9th Cir. 2023). California's long-arm statute provides for personal jurisdiction to the maximum that due process allows. Cal. Civ. Proc. Code § 410.10; *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980). A court may exercise personal jurisdiction over a nonresident defendant with "certain minimum contacts" with the forum "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Mavrix*, 647 F.3d at 1223 (cleaned up) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

Personal jurisdiction is general or specific. *Bristol-Myers Squibb Co. v. Super. Ct.*, 582 U.S.

---

[16] Consents – ECF Nos. 6, 29.

255, 262 (2017). The plaintiffs assert specific personal jurisdiction.[17] The court's specific-jurisdiction inquiry focuses on the relationship among the defendant, the forum, and the litigation. *Walden v. Fiore*, 571 U.S. 277, 284 (2014). The Ninth Circuit employs a three-part test:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004). The plaintiff must prove the first two parts. *Picot v. Weston*, 780 F.3d 1206, 1211–12 (9th Cir. 2015). If it does, then the defendant must present a compelling case that the presence of other considerations renders jurisdiction unreasonable. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985).

A plaintiff satisfies the first part by "demonstrating that the defendant either purposefully availed itself of the privilege of conducting activities in the forum or purposefully directed its activities at the forum," *Washington Shoe Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668, 672 (9th Cir. 2012), *abrogated on other grounds by Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064 (9th Cir. 2016), or "some combination thereof," *Yahoo! Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006) (en banc) (per curiam). For claims sounding in tort, like the privacy violations asserted here, the Ninth Circuit most often applies a purposeful-direction test.[18] *Briskin*, 135 F.4th at 752–53, 751 & n.10 (the rule is not rigid and allows "some combination thereof").

Purposeful direction exists if the defendant (1) commits an intentional act (2) expressly aimed at the forum (3) that causes harm that the defendant knows will be suffered in the forum. *Washington Shoe*, 704 F.3d at 673. The defendant need not be physically present in the forum state: "it is an

---

[17] Opp'n – ECF No. 42 at 7–9.

[18] The parties agree that the purposeful-direction test applies. Mot. – ECF No. 39 at 14–15; Opp'n – ECF No. 42 at 7–9.

1    inescapable fact of modern commercial life that a substantial amount of business is transacted solely

2    by mail and wire communications across state lines, thus obviating the need for physical presence."

3    *Burger King*, 471 U.S. at 476. Instead, the so-called *Calder* effects test focuses on the forum where

4    the defendant's acts were felt, whether or not the acts themselves occurred in the forum. *Mavrix*,

5    647 F.3d at 1288. There is personal jurisdiction when the acts are such that the defendants "must

6    reasonably anticipate being haled into court" in the forum to answer for their acts. *Calder v. Jones*,

7    465 U.S. 783, 788–90 (1984) (cleaned up) (asserted specific jurisdiction over the non-resident

8    National Enquirer for a libelous story distributed in California about a well-known California actor

9    because the acts were aimed at California, and the actor suffered injury here).

10    Parts one and three of the purposeful-direction test are met: CYH's alleged acts were intentional

11    and caused harm here. The issue is part two: whether CYH expressly aimed its conduct at

12    California. CYH argues that its website lacks a forum-specific focus, while the plaintiffs argue that

13    shipping products to the district is enough.[19] Both parties cite *Herbal Brands, Inc. v. Photoplaza,*

14    *Inc.* There, Herbal Brands, a Virginia corporation with its principal place of business in Arizona,

15    sued a New York company selling Herbal Brand products on Amazon, in violation of the Lanham

16    Act. Because two factors existed — the product sales must be part of the defendant's regular course

17    of business (as opposed to random, isolated, or fortuitous), and the defendant must exercise some

18    level of control over the ultimate distribution of products beyond placing them into the stream of

19    commerce — the court found specific personal jurisdiction. *Herbal Brands*, 72 F.4th at 1088–89.

20    CYH contends that there is no personal jurisdiction here because its website and business have

21    no California-specific focus: its California revenues are thirteen percent of revenues, it does not

22    hyper-target California and treats all states similarly, and it merely allows potential ketamine

23    patients to pre-purchase ketamine therapy packages that depend on independent doctor approval,

24    which is not a forum-specific focus.[20] The plaintiffs counter that CYH uses its website to ship

25    medication and provide live medical appointments to California customers, which satisfies the

26

---

27    [19] Both parties focus on this prong. Mot. – ECF No. 39 at 14–17; Opp'n – ECF No. 42 at 7–9.

28    [20] Mot. – ECF No. 39 at 15.

United States District Court
Northern District of California

1    *Herbal Brands* factors: product sales that are part of CYH's regular course of business and exercise

2    of control over the distribution of products beyond placing them into the stream of commerce.[21]

3        This lawsuit involves known California customers, who completed forms to obtain ketamine

4    treatment, had a consultation with a California clinician, and had their PII intercepted, all through

5    CYH's online business, which serves customers in twenty-one states, including California. CYH's

6    business model is not a passive website. *Id.* at 1088–92; *Briskin*, 135 F.4th at 752–53, 758.

7        In *Briskin*, a decision issued after briefing in this case, the Ninth Circuit held that the

8    ecommerce platform Shopify was subject to personal jurisdiction in California. There, a California

9    customer bought athletic apparel online from a California retailer, and Shopify — which

10   facilitated the credit-card transaction — embedded tracking cookies that harvested personal

11   information (including geolocation, IP address, and browser identity), developed a customer

12   profile, and marketed it widely, including to California merchants. *Briskin*, 135 F.4th at 745–46.

13   Shopify's acts were intentional, and they violated the customers' rights to data privacy and

14   security, thus satisfying factors one and three. *Id.* at 756 (parties did not dispute these factors).

15       The disputed issue was whether Shopify's acts were expressly aimed at California under factor

16   two, or, as Shopify contended, a "mere happenstance arising from the California consumers'

17   choice to do business with a merchant" that had contracted with Shopify. *Id.* The Ninth Circuit

18   held that Shopify knew the customers' location, and obtaining their customer data for its own

19   commercial gain was express aiming. *Id.* (analogizing to pre-internet cases where California courts

20   had specific jurisdiction over persons who entered their homes by deceptive means to obtain

21   personal information for commercial gain). It did not matter that Shopify operated nationally and

22   was agnostic about its customers' location: operating everywhere does not mean that personal

23   jurisdiction lies only in a corporation's principal place of business and state of incorporation. *Id.* at

24   757 (citing *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 355, 363 (2021)).

25       Shopify relied on earlier precedent, *AMA Multimedia, LLC v. Wanat*, to argue that because eight

26   percent of its worldwide merchants were in California, there was no forum-specific focus. *Id.* (citing

27

28   ———————————
     [21] Opp'n – ECF No. 42 at 7–8.

*AMA*, 970 F.3d 1201, 1210–11 (9th Cir. 2020)). *AMA* misrelied on *Mavrix* to conclude that a porn website was not expressly aimed at the United States because the market for adult content was global. *Id.* at 757 (citing *AMA*, 970 F.3d at 1210 and analyzing *Mavrix*, 647 F.3d at 1230). Factors for evaluating whether a nonresident defendant has done "something more" can be the interactivity of the defendant's website, the geographic scope of the defendant's commercial ambitions, and the individual targeting of a forum plaintiff. *Id.* at 757–58. *AMA*'s adding a requirement for a forum-specific focus had no basis in Ninth Circuit precedent and ran contrary to Supreme Court authority establishing jurisdiction over a company in a state where its product causes injury when the company serves, "directly or indirectly, the market for its product in many states." *Id.* at 758 (quoting *World-Wide Volkswagen*, 444 U.S. at 297) (citing *Ford Motor*, 592 U.S. at 355, 365) (Ford purposefully availed itself of Montana's and Minnesota's markets, even though its business is everywhere). The Ninth Circuit thus overruled *AMA* and held that even when an interactive platform cultivates a national audience for commercial gain, it expressly aims its conduct toward a forum state when its contacts are its own choice, and not random, isolated, or fortuitous. *Id.* (citing *Mavrix*, 647 F.3d at 1230 and *Ford Motor*, 592 U.S. at 359). The court distinguished *Walden*, where — in a lawsuit brought by Nevada residents against a Georgia defendant contesting an asset seizure at a Georgia airport while the plaintiffs were in transit to Nevada — the Nevada court lacked personal jurisdiction over the defendant, who had no link to the Nevada forum. By contrast, Shopify knew about its California customers, conducted business with them, interacted with them as an intermediary for merchants, installed tracking software on customer devices in California, and tracked their activities. *Id.* at 758–59 (analyzing *Walden*, 571 U.S. at 280–81, 285, 288–90).

CYH's acts meet these criteria: CYH knew about its California customers, conducted business with them, required and facilitated their communication with California medical clinicians, and intercepted their PII. Despite its national platform, CYH's contacts with California are express aiming because they are its choices and are not random, isolated, or fortuitous. *Id.* at 756–59. CYH's arguments — that its California revenues are only thirteen percent of overall revenues and it does not hyper-target California and instead treats all states similarly — are foreclosed by *Briskin*'s overruling *AMA*'s requirement for a forum-specific focus. *Id.* at 758.

1    The plaintiffs also satisfied part two of the test: their claims must arise out of or be related to

2    the CYH's contacts with the forum state. *Id.* at 760; *Ford Motor*, 592 U.S. at 359. Part two

3    requires an affiliation between the forum state and the controversy, subjecting the company to the

4    state's regulation. *Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972, 983 (9th Cir. 2021). Under *Ford*

5    *Motor*, "arise out of" and "relate to" are alternatives: "for a claim to arise out of a defendant's

6    forum contacts requires causation, while a claim can relate to those contacts[] even absent

7    causation." *Yamashita v. LG Chem, Ltd.*, 62 F.4th 496, 504–05 (9th Cir. 2023).

8    The plaintiffs' claims arise out of CYH's contacts with its California customers, including

9    requiring the customers' communication with California medical clinicians and intercepting their

10    PII. The claims also relate to CYH's California contacts because the plaintiffs allege injury caused

11    by CYH's contacts with its California customers, intercepting their PII and causing privacy

12    injuries. *Briskin*, 135 F.4th at 760.

13    Part three of the test requires CYH to present a compelling case that the exercise of jurisdiction

14    is not reasonable. *Schwarzenegger*, 374 F.3d at 802. The Ninth Circuit applies a seven-factor

15    balancing test to assess the reasonableness of asserting personal jurisdiction: (1) the extent of the

16    defendant's interjection into the forum state's affairs; (2) the defendant's burden defending a case

17    in the forum; (3) any conflict with the sovereignty of the defendant's state; (4) the forum state's

18    interest in adjudicating the dispute; (5) the most efficient resolution of the controversy; (6) the

19    importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the

20    existence of an alternative forum. *Herbal Brands*, 72 F.4th at 1096. CYH does not contend that it

21    is burdensome to defend here, that jurisdiction here would create a conflict, that California lacks

22    an interest in defending California consumers' privacy rights, or that California would not provide

23    an efficient resolution of the dispute. Its pre-*Briskin* argument about the extent of its business

24    activities in California implicates factors one and two, the extent of its interjection into the forum

25    state's affairs and the burden of defending here. The Ninth Circuit rejected a similar argument: the

26    extent of Shopify's purposeful direction of its business activities supported specific personal

27    jurisdiction and, balancing all the factors, the exercise of personal jurisdiction in California was

28    reasonable. *Briskin*, 35 F.4th at 761 (also rejecting Shopify's argument that it was unfair to assert

United States District Court
Northern District of California

jurisdiction because it could lead to specific jurisdiction in all fifty states; that result might be true, and it might not, depending on whether other states had laws like California's protecting their citizens from like privacy violations). That result controls here: balancing all factors, personal jurisdiction in California is reasonable.

### 2. Arbitration Clause

Under the Federal Arbitration Act (FAA), "arbitration is a matter of contract, and courts must enforce arbitration contracts according to their terms." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 67 (2019); *Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1259 (9th Cir. 2017) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)). "Section 2 of the FAA makes agreements to arbitrate 'valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Poublon*, 846 F.3d at 1259 (citing 9 U.S.C. § 2). "By its terms, the Act leaves no place for the exercise of discretion by a district court, but instead mandates that the district court *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (cleaned up) (citing 9 U.S.C. §§ 3–4). "The court's role under the Act is therefore limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000) (citing 9 U.S.C. § 4). "If the response is affirmative on both counts, then the Act requires the court to enforce the arbitration agreement in accordance with its terms." *Id.*

The issue is whether CYH can compel plaintiff Martinez to arbitration. She raises three grounds: (1) the arbitration clause does not apply retroactively to PII and PHI that she disclosed before she agreed to the arbitration clause; (2) the privacy claims are not within the scope of the arbitration agreement, which covers only claims about ketamine treatment, not privacy claims; and (3) the arbitration clause is procedurally and substantively unconscionable: it is procedurally unconscionable as a contract of adhesion and is hidden on an unknown page in the terms of service,

and it is substantively unconscionable because it does not specify what the plaintiff must pay.[22] The arbitration agreement is not procedurally or substantively unconscionable, and it covers all claims.

### 2.1    Unconscionability

Arbitration agreements are unenforceable "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening the FAA. *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996). In California, the party opposing arbitration has the burden of proving any defense, such as unconscionability. *Poublon*, 846 F.3d at 1260 (quoting *Pinnacle Museum Tower Ass'n v. Pinnacle Mkt. Dev. (US), LLC*, 55 Cal. 4th 223, 236 (2012)).

In California, contractual unconscionability has procedural and substantive components. *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 114 (2000). Procedural unconscionability focuses on oppression or surprise due to unequal bargaining power, and substantive unconscionability focuses on overly harsh or one-sided results. *Id.* Both must be present but not in the same degree. *Id.* There is a sliding scale: the more substantively oppressive the contract term, the less evidence of procedural unconscionability is needed to conclude that the term is unenforceable, and vice versa. *Poublon*, 846 F.3d at 1260 (quoting *Sanchez v. Valencia Holding Co.*, 61 Cal. 4th 899, 910 (2015)).

The plaintiff contends that the arbitration clause is procedurally unconscionable: it is a contract of adhesion because she had to sign it to buy CYH's products, and it was hidden in the twenty-six subsections of the agreement and was not bolded, capitalized, or otherwise apparent.[23] It is not procedurally unconscionable: the plaintiff agreed to the terms of service, which were conspicuous.

First, the plaintiff does not deny that she accepted the terms of service: she had to check a box agreeing to the website's terms of service and privacy policy, both presented via a conspicuous

---

[22] Opp'n – ECF No. 42 at 15–17.

[23] *Id.* (citing the website www.chooseyourhorizon/legal/terms).

United States District Court
Northern District of California

United States District Court
Northern District of California

blue hyperlink, after inputting all billing, shipment, and payment information and before clicking Pay to complete her purchase. Then, the website automatically redirected her to schedule a mandatory consultation, which required her to select a clinician, input her identification and shipping information, and then agree — in a final section titled Terms & Conditions to the blue hyperlinked Terms of Use, Privacy Policy, and Notice of Privacy Policy — to the terms of use and privacy policy by checking a box, confirming that she had "read and agreed to the terms," and then clicking Complete Appointment. Courts routinely enforce a plaintiff's acceptance of terms of service under circumstances like these. *Oberstein v. Live Nation Entm't, Inc.*, 60 F.4th 505, 515–16 (9th Cir. 2023) (hyperlink to terms of service in a bright-blue font; notices were not buried but were placed on top of or below each action button); *Cordas v. Uber Techs. Inc.*, 228 F. Supp. 3d 985, 990 (N.D. Cal. 2017) (clicked DONE to complete the sign-up process on a page clearly displaying a notice that by creating an Uber account, the user agreed to its terms of service and policy policy). The plaintiff cites no cases to support her one-line adhesion argument — that she had to sign if she wanted to buy CYH's product — other than an *id.* citation to *Armendariz*, without analysis.[24] That case held that mandatory arbitration agreements — presented as a condition of employment — do not invalid arbitration clauses as procedurally unconscionable. *Armendariz*, 24 Cal. 4th at 114–15.

Second, the plaintiff cites only CYH's website to support her argument that the arbitration clause was buried in the terms of service.[25] It was not: the arbitration clause — set forth in the Statement — is in the third section, titled **Disputes** (in bold). The two sections that precede it are titled **Acceptance of Terms of Use** (use of CYH's service requires accepting the conditions) and **Your Relationship with Us** (describing CYH's services). The side panel has hyperlinked titles to all sections in the terms of use. This is conspicuous. The plaintiff cites no cases supporting a different outcome. *OTO, L.L.C. v. Kho* involved a prolix agreement with an extremely small font and a dense arbitration clause given to a low-level employee under circumstances that suggested

---

[24] *Id.* at 15 (the previous section cited *Armendariz* to support the procedural and substantive components for contractual unconscionability).

[25] *Id.* at 16 & n.3 (citing www.chooseyourhorizon/legal/terms).

1    that he had to sign it immediately, else lose his job. 8 Cal. 5th 111, 128 (2019). *A&M Produce Co.*

2    *v. FMC Corp.* buried a consequential-damages provision in the middle of the last page in

3    inconspicuous font. 135 Cal. App. 3d 473, 490 (1982); *cf. Stanfield v. Tawkify, Inc.*, 517 F. Supp.

4    3d 1002, 1006 (N.D. Cal. 2021) (in one-way arbitration agreement, itself unconscionable, the

5    "arbitration provision was a needle in a haystack").

6        The agreement is not procedurally unconscionable. Because both procedural and substantive

7    unconscionability must be present, the arbitration clause is enforceable. In any event, the only

8    argument about substantive unconscionability is that the clause does not specify the fees that the

9    plaintiff must pay. The plaintiff is required to download a demand for arbitration from the AAA,

10    and if those rules applied, they might require her to pay administrative fees up to $15,000.[26] The

11    defendant dismissed that argument at the hearing as speculative and disavowed any intention to

12    require those fees. Under these circumstances, the plaintiff has not shown substantive

13    unconscionability.

14        Generally, "when an employer imposes mandatory arbitration as a condition of employment, the

15    arbitration agreement or arbitration process cannot generally require the employee to bear

16    any *type* of expense that the employee would not be required to bear if he or she were free to bring

17    the action in court." *Armendariz*, 24 Cal. 4th at 110–11. Here, the plaintiff would be required to pay

18    a filing fee in federal district court and would be required to file a like arbitration fee unless she

19    could show an inability to pay it. *Aronow v. Super. Ct.*, 76 Cal. App. 5th 865, 886 (2022) (if a

20    plaintiff cannot pay the arbitrator's fee, the defendant should be given the chance to either to pay

21    the plaintiff's share of the arbitrator or to waive the right to arbitrate). The court also has discretion

22    to sever a problematic clause. *Armendariz*, 24 Cal. 4th at 121–27. But the plaintiff has pointed to no

23    facts and no cases to support the conclusion that she would pay anything beyond the equivalent of a

24    filing fee. CYH disavowed that intention. The plaintiff did not show substantive unconscionability.

25

26

27

28    [26] *Id.* at 16.

United States District Court
Northern District of California

### 2.2    Scope of the Arbitration Agreement

The claims involve invasion of privacy from CYH's alleged collection of PII and PHI, in violation of California law. The terms of service, which incorporated the privacy policy, require arbitration for "any controversy, dispute, or claim arising out of, or relating in any way" to the terms or the customer's use of CYH's site or service. The arbitration clause applies to the privacy claims.

Under arbitration clauses, the fact allegations "must at least touch matters covered by the contract containing the arbitration clause," "whatever the legal labels attached to those allegations." *Jackson v. Amazon.com, Inc.*, 65 F.4th 1093, 1101 (9th Cir. 2023) (cleaned up). The claims here involve unauthorized interception of customers' private information during business transactions, and CYH required its customers to assent to its terms of service and privacy policy before completing the purchase. The disputes — taking PII and PHI — arise from the business transaction and involve the privacy policy. *See id.* at 1102 (analyzing *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721–25 (9th Cir. 1999), which involved a contract for the development of airbag technology; the arbitration clause for "all disputes arising in connection with this Agreement" applied to antitrust, defamation, trademark-violation, trade-secret misappropriation, and breach of NDO claims). In contrast to the transaction-related breaches of privacy here, the privacy claims in *Jackson* were wholly unrelated to the parties' contract: Amazon allegedly monitored its drivers' private conversations during off hours in a private Facebook group, which was employer misconduct unrelated to the employment agreement. *Id.* at 1095, 1101–03.

### 2.3    Retroactivity

The plaintiff contends that the arbitration clause does not apply to the wrongful collection of her PII and PHI before she agreed to the terms of service.[27] Arbitration is required for all claims — including the privacy claims here — arising out of, or relating any way, to the terms of service or the customer's use of CYH's site or service, without temporal limitation.

---

[27] *Id.* at 9–12.

1    What matters is the substance of the claims, not their timing. Courts have applied arbitration

2    clauses without a temporal limitation to claims that precede the plaintiff's acceptance of a

3    contract's terms. *See, e.g., Azeveda v. Comcast Cable Commc'ns LLC*, No. 5:19-CV-01225-EJD,

4    2019 WL 5102607, at *6 (N.D. Cal. Oct. 11, 2019) (arbitration clause for "claims related to or

5    arising from any aspect of the employment relationship" applied to disputes that predated the

6    contract, which did not have a temporal limitation); *Trujillo v. Gomez*, No. 14cv2483 BTM (BGS),

7    2015 WL 1757870, at *8 (S.D. Cal. Apr. 17, 2015) (similar arbitration clause in distribution

8    agreement for lighting products had no temporal limitation and applied to disputes that predated

9    the agreement); *cf. Castro v. ABM Indus., Inc.*, No. 17-cv-3026-YGR, 2018 WL 2197527, at *4

10    (N.D. Cal. May 14, 2018) (CBA binding-mediation clause for "all Covered Claims, whenever they

11    arise" was language covering future conduct).

12    Here, the plaintiff accepted the terms of service, including the arbitration agreement and

13    privacy policy, before completing her transaction. Courts enforce like arbitration clauses in data-

14    disclosure cases. *See, e.g., I.C. v. Zynga, Inc.*, No. 20-cv-01539-YGR, 2021 WL 3271187, at *1

15    (N.D. Cal. July 30, 2021). The court enforces the arbitration clause here.

16

17                                    **CONCLUSION**

18    The court denies the motion to dismiss for lack of personal jurisdiction, compels arbitration of

19    plaintiff Martinez's claims, and stays her case pending arbitration. *Smith v. Spizzirri*, 601 U.S.

20    472, 474, 476–78 (2024) (per curiam) (requiring stay). This resolves ECF No. 39.

21    **IT IS SO ORDERED.**

22    Dated: August 31, 2025

23                                    _____

24                                    LAUREL BEELER
                                      United States Magistrate Judge

25

26

27

28

United States District Court
Northern District of California